# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 04-282 (JRT) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING MOTION TO SUPPRESS STATEMENTS** |
| MOHAMAD KAMAL ELZAHABI, | |
| Defendant. | |

Thomas M. Hollenhorst and W. Anders Folk, Assistant United States Attorneys, **OFFICE OF THE UNITED STATES ATTORNEY**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415; John W. Van Lonkhuyzen, **UNITED STATES DEPARTMENT OF JUSTICE**, Tenth & Constitution Avenue NW, Room 2738, Washington, DC 20530; for plaintiff.

Paul C. Engh, **ENGH LAW OFFICE**, 220 South Sixth Street, Suite 215, Minneapolis, MN 55402; Peter B. Wold and Aaron J. Morrison, **PETER B. WOLD, PA**, 247 Third Avenue South, Minneapolis, MN 55415; for defendant.

Defendant Mohamad Kamal Elzahabi has been charged with two counts of making false statements in violation of 18 U.S.C. § 1001(a)(2), and three counts of possessing fraudulent immigration documents in violation of 18 U.S.C. § 1546(a). The case is before the Court on defendant's motion to suppress statements. For the reasons explained below, the Court denies the motion.

## BACKGROUND

Defendant seeks to suppress statements made during interviews with agents of the Federal Bureau of Investigation ("FBI") that began on April 16, 2004 and continued for 17 days. The following facts are derived from the testimony of FBI Special Agent Harry Samit at the evidentiary hearing held by the Court on April 4, 2006.

The Boston division of the FBI had been investigating defendant for several years, and had concluded that defendant was an associate of several terrorist suspects of interest to the Boston division. Defendant moved to Minnesota during the fall of 2003. The Minneapolis division of the FBI then opened an investigation on defendant and he was placed under close surveillance. The primary goal of the investigation was to determine whether defendant was still in contact with the terrorist suspects.

Members of the Joint Terrorism Task Force in the Minneapolis Police Department aided in the investigation of defendant. Sergeant Andrew Smith was assigned to investigate defendant in connection with an unrelated criminal offense, and over the course of that investigation Smith worked to develop a rapport with defendant. Defendant appeared to consider Smith a friend, and defendant invited Smith to attend social functions and prayer at the mosque attached to his residence. While defendant knew Smith was a member of the Minneapolis Police Department, it appears that defendant did not know that Smith was a member of the Joint Terrorism Task Force.

On April 16, 2004, Smith left defendant a voice mail message indicating his desire to attend a prayer session at the mosque that afternoon. When defendant returned the phone call later that day, defendant indicated that he had plans to leave the country and

establish a trucking business with his brother in Canada. Defendant told Smith that he wanted to obtain United States citizenship so that he could more easily cross the international border. Defendant asked Smith whether he would encounter any immigration or security issues that would prevent him from obtaining citizenship. Smith offered to arrange a meeting that evening with an associate of his who was familiar with immigration rules. Smith contacted another member of the Joint Terrorism Task Force, who agreed to pose as a former employee of the Immigration and Naturalization Service ("INS"). In addition, Smith contacted FBI Special Agent Harry Samit and Special Agent Christopher O'Leary, who specialize in terrorism investigation.

Smith arranged to have defendant meet with the person posing as the former INS employee over dinner that evening. During the course of that dinner, defendant was told that the FBI keeps lists of persons of security interest. Smith offered to run defendant's name through the systems at his disposal to determine whether his name might appear on any watch lists. Smith also offered to contact a friend of his in the FBI who might be able to help if defendant's name appeared on a watch list. After the dinner had ended, Smith went to the Minneapolis FBI office to explain the situation to Samit and O'Leary, and they decided how to proceed. Later that evening, Smith contacted defendant and told him that his name was listed as someone of interest to the FBI. Defendant requested that Smith set up a meeting with his friend in the FBI.

In the late hours of April 16, 2004, Smith introduced defendant to Samit and O'Leary. The FBI agents met defendant on the street alongside Smith's car. Smith told defendant that the agents work on terrorism and could explain why defendant was on the

watch list. Defendant again explained that he was interested in speaking with the agents because he wanted United States citizenship and wanted to know how he could get his name removed from the watch list. The agents began to interview defendant, asking him about things that would typically trigger presence on a watch list, such as foreign travel, national origin, and membership in certain groups.

Defendant was dressed only in a T-shirt and jeans, and the weather was cool. Defendant accepted an offer by the agents to continue the interview in Smith's parked car. Defendant sat in the backseat with Samit, while Smith and O'Leary sat in the front seat. The agents asked detailed questions about defendant's foreign travel. Samit testified at the evidentiary hearing that defendant did not at first admit to all the countries to which he had traveled, and that Samit told defendant that they knew he had gone to Afghanistan and had received a combat wound. Samit testified that defendant then asked "how much trouble am I in?" (Tr. at 85.) Samit replied that as investigators they could not answer that question. At this time defendant said he was warm enough and he let himself out of the police vehicle.

A short time thereafter, Samit suggested that they continue the interview at Minneapolis field office of the FBI. Samit explained that it would better to continue the interview in a more comfortable place with fewer distractions. Samit further explained that the FBI needed help from people with his knowledge and experience, and that the FBI would be very interested in learning more about his travel, experiences, and associates. Defendant agreed to continue the interview at the FBI office.

Upon arriving at the FBI office, defendant was offered water and an opportunity to use the restroom. Agents escorted defendant to the restroom and remained at the door while defendant used the restroom. The agents then brought defendant to the break room at the FBI office. Agents would typically eat their lunches in this room. It has windows, a large conference table, soda machine, and a television. At this time of the night, however, defendant and the agents were the only people in the room.

The interview resumed at about 1:00 a.m. on April 17, 2004. At the start of the interview, the agents thanked defendant for his cooperation and informed him that participation in the interview was voluntary on his part. He was told that he could stop the interview if he later decided that he no longer wished to cooperate. Defendant appeared eager to cooperate and the interview continued over the course of the next four to five hours. Defendant did not appear tired despite the late hour. Defendant was previously employed as a long haul truck driver and was accustomed to driving through the night. His normal waking hours were evening to early morning.

At about 6:00 or 7:00 a.m. on April 17, 2004, the interview was completed. The agents again thanked defendant for his cooperation and reminded him that the interview was voluntary. The agents explained that some of the information he provided was very useful to them, and the agents asked him whether he would agree to resume the interviews later. Defendant agreed that there was more that could be talked about. The agents offered to have agents accompany defendant to a nearby hotel instead of returning him to his residence. They explained that the FBI would pay for the hotel and that

defendant could rest, work out, and order meals.  The agents suggested that the interview continue after defendant had an opportunity to rest.

The hotel was within walking distance of the FBI field office.  The room in which defendant stayed had kitchen facilities, a family room, and a bedroom.  Two agents were assigned to accompany defendant at all times.  The agents stayed in the family room, and defendant had the bedroom to himself.  The agents accompanied defendant if he wished to use the workout room or go to a restaurant. The phone in the bedroom had been removed, and defendant's cell phone was left with the agents.

The interview resumed at about 7:00 p.m. on April 17, 2004.  The agents again reminded defendant that the interview was voluntary and that he could stop participating at any time.  They also informed him that he had the right to an attorney.  Defendant replied that he did not need a lawyer and the agents proceeded with the interview.  The interview lasted five or six hours.

The interview process continued over the course of 17 days.  A total of 13 interviews were conducted.  At the start of each interview, the agents reminded defendant that his participation in the interviews was voluntary and that he could stop participating at any time.

Over the 17-day period, defendant participated in two polygraph tests.  The first test was administered on April 18, 2004, and the second test was administered on May 2, 2004.  As part of the polygraph process, there is an advice of rights procedure.  On April 18, 2004, one of the agents read defendant his rights, and then defendant was asked to read the advice of rights form aloud as well.  Defendant signed the advice of rights

form and Samit and O'Leary witnessed it. This was the first time defendant received a full Miranda warning. Defendant also signed forms indicating his consent to have his residence searched and his consent to the polygraph examination. Before the polygraph exam on May 2, 2004, defendant again signed an advice of rights form and a form indicating his consent to the polygraph examination.

Defendant signed a document titled "Voluntary Statement" on April 27, 2004. (Gov't Ex. 4.) The document states that defendant "voluntarily and willingly accompanied Special Agents of the FBI since April 16, 2004." It states that defendant has been repeatedly told that he could leave at any time and can refuse to answer any questions. It states that defendant has "chosen to answer [the agents'] questions in hopes of assuring them that I do not pose a threat to the United States." It states that defendant hopes to obtain United States citizenship but that the agents have made no promises to him. It states that no weapons were displayed to defendant and that he has not been threatened. It states that defendant stayed at a hotel in downtown Minneapolis where FBI agents have accompanied him but that his movements have not been restrained.

The agents conducted a videotaped interview on May 3, 2004. A transcript of the beginning of the interview was prepared. Defendant indicates that he has been trying to be helpful and to prove himself, but states that the agents "take everything against me." (Gov't Ex. 7.) O'Leary states, "But I want you to understand before we do this again this has got to be completely voluntary on your part. Okay? You are not under arrest." Defendant replies, "From the beginning it has been voluntary." O'Leary continues, "Absolutely. You are not under arrest. You don't have to answer our questions. You

can stop at any time. You can decide if you want to leave at any time. Okay? This has got to be voluntary." Defendant then replies, "It is always voluntary. I know you guys are under pressure. I'm trying to help but you guys won't understand." O'Leary then summarizes the plan for the questioning, and then Samit says to defendant, "And just remember, we're not putting you under pressure. Okay? We're here working through this time line." Defendant smirks and interrupts Samit stating, "Two weeks, Harry? Two weeks, Harry? . . . But when you press my brain that's it. [I] mean, what do you want. You should know me by now." Samit then assures defendant that the questioning will cover "easy stuff." Defendant replies, "Can I have a drink? God, I would, my head gonna explode." The interview lasted about four hours. At the end of the interview, the agents thanked defendant for his cooperation and indicated that they would like the interview to continue on the following day.

The interview resumed on May 4, 2004. During the course of that interview, the agents showed defendant photographs and asked him if he could identify the individuals pictured. The agents and defendant disagreed about the identity of one of the individuals, and defendant got upset. At that point, he told the agents that he no longer wanted to talk with them. The interview stopped immediately.

The agents spoke with an Assistant United States Attorney, and the attorney instructed agents to place defendant under arrest. On the evening of May 4, 2004, defendant was arrested on a material witness warrant from the Southern District of New York. During the course of the arrest, defendant told one of the agents that he should have gotten a lawyer.

Defendant was charged by complaint on June 24, 2004. He was indicted on July 7, 2004. The prosecution filed a superceding indictment on December 6, 2005. On February 28, 2006, defendant filed the motion to suppress statements, and on April 4, 2006, the Court held an evidentiary hearing and heard oral argument on the motion.

## ANALYSIS

### I.   MOTION TO SUPPRESS STATEMENTS

#### A.   Provision of a Miranda Warning

"The basic rule of *Miranda* is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "*Miranda* accordingly requires that a warning as to the availability of the privilege against self-incrimination and to the assistance of counsel be issued *prior to questioning* whenever a suspect is (1) interrogated (2) while in custody." *Id.* (emphasis original).

An individual need not be arrested formally to be "in custody." As the Eighth Circuit in *Griffin* explained:

> Custody occurs either upon formal arrest or under *any other circumstances* where the suspect is deprived of his freedom of action in *any* significant way. In determining whether a suspect is "in custody" at a particular time we examine the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a "reasonable person in the suspect's position would have understood his situation" to be one of custody. If [the defendant] believed his freedom of action had been curtailed to a degree associated with formal arrest, and that belief was reasonable from an objective viewpoint, then [the defendant] was being

>held in custody during the interrogation. The determination of custody arises from an examination of the totality of the circumstances.

922 F.2d at 1347 (emphasis original) (citations omitted). The Eighth Circuit has articulated a six-element test for this determination of custody, including:

>(1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;
>
>(2) Whether the suspect possessed unrestrained freedom of movement during questioning;
>
>(3) Whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;
>
>(4) Whether strong arm tactics or deceptive stratagems were employed during questioning;
>
>(5) Whether the atmosphere of the questioning was police dominated; or,
>
>(6) Whether the suspect was placed under arrest at the termination of the questioning.

*Griffin*, 922 F.2d at 1349. The first three indicia are "mitigating factors," the presence of one or more of which "would tend to mitigate the existence of custody at the time of the questioning." *Id.* The final three indicia are "coercive factors," the presence of one or more of which would tend to compel a finding of custody. *Id.*

Defendant argues that his motion to suppress should be granted because the agents obtained statements from him in a custodial setting prior to providing him a full Miranda warning. He asserts that he was in custody starting from the interviews at the FBI office on April 17, 2004. Defendant acknowledges that he received a Miranda warning prior to his polygraph examination on April 18, 2004, but argues that this subsequent warning

- 10 -

cannot cure the prior custodial interviews on April 17, 2004 that occurred without the benefit of the Miranda warning. *See Missouri v. Seibert*, 542 U.S. 600 (2004); *United States v. Ollie*, 442 F.3d 1135, 1142-1143 (8th Cir. 2006) (holding that an officer's failure to give a Miranda warning prior to an initial custodial interview may render inadmissible statements given after a subsequent Miranda warning). Defendant asserts that he was in custody at the FBI office because he was never free to actually leave.

To determine whether defendant was in custody during the interview that took place on April 17, 2004, the Court applies the six *Griffin* factors. *Griffin*, 922 F.2d at 1349. The first factor asks whether the defendant was told that the interview was voluntary, that he was free to leave, or that he was not under arrest. *Id.* Before the interview at the FBI office commenced, the agents thanked defendant for his cooperation and informed him that participation in the interview was voluntary on his part. He was told that he could stop the interview if he later decided that he no longer wished to cooperate. An explicit assertion that the defendant may end the encounter provides "a clear understanding of his or her rights and generally removes any custodial trappings from the questioning." *Ollie*, 442 F.3d at 1138 (citing *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)). The first factor weighs heavily towards a finding of non-custodial status.

The second factor asks whether the defendant possessed unrestrained freedom of movement during questioning. *Griffin*, 922 F.2d at 1349. It is undisputed that agents accompanied defendant at all times, but no evidence was presented that agents restrained defendant's freedom of movement during the questioning. Indeed, defendant signed a

statement indicating that he was "never restrained in any way" during the interviews. (Gov't Ex. 4.) This negative finding does not mean that defendant was free to move about, however, because there was no evidence presented that defendant tried to move about or leave the interview room during the questioning. *See Ollie*, 442 F.3d at 1138. It is therefore impossible to determine whether defendant retained his freedom of movement during the questioning.[1]

The third factor asks whether the defendant initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions. *Griffin*, 922 F.2d at 1349. Here, Smith initiated the first contact between police and defendant on April 16, 2004, but Smith did not contact defendant for questioning. Rather, Smith contacted defendant to accept his invitation to attend an afternoon prayer session. Smith later arranged the contact between defendant and the FBI agents, but the contact occurred only after defendant asked Smith to make the arrangements. Although defendant sought out contact with the FBI agents, it is clear to the Court that Smith orchestrated the meeting so that FBI agents would be in a position to ask defendant questions. Under these circumstances, the Court cannot find that defendant initiated contact with authorities. However, after contact with the FBI was established, it is clear that defendant voluntarily acquiesced to the agents' request that he respond to their questions. Defendant appeared

---

[1] The prosecution points out that defendant let himself out of Smith's parked police car during the interview on the street. Defendant clearly enjoyed freedom of movement during the interview on the street, but the question for the Court is whether defendant retained his freedom of movement during the interview at the FBI office. Although there is no evidence that defendant attempted to leave the interview room at the FBI office, the fact that defendant was previously allowed to move about freely helps to set a non-custodial tone for the subsequent interview at the FBI office.

eager to cooperate with the agents, and he voluntarily agreed to submit to the questioning at the FBI office.  This factor therefore weighs towards a finding of non-custodial status.

The fourth factor asks whether strong arm tactics or deceptive stratagems were employed during questioning.  *Griffin*, 922 F.2d at 1349.   Defendant was never threatened, nor were weapons ever displayed to him.  Smith deceived defendant into believing that Smith was acting as a friend to help defendant obtain United States citizenship.  However, this deceit does not bear on whether the defendant would have felt free to terminate the interviews.  *See Ollie*, 442 F.3d at 1139 (holding that the only deceit that affects a custody determination is that which would act to prevent a reasonable person from terminating an interview).  Neither was defendant's desire to obtain citizenship used to coerce cooperation.  *Cf. United States v. Beraun-Panez*, 812 F.2d 578, 581 (9th Cir. 1987) (finding that defendant was in custody when a reasonable person could interpret the remarks of officers as requiring the defendant to confess if the defendant was to avoid deportation).  The Court finds that no strong arm tactics or relevant deceptive stratagems were used.  This factor therefore weighs toward a finding of non-custodial status.

The fifth factor asks whether the atmosphere of the questioning was police dominated.  *Griffin*, 922 F.2d at 1349.  The interview took place at the FBI office, which is the "home turf" of the agents.  *Ollie*, 442 F.3d at 1139.  In addition, the interview lasted for several hours.  This factor therefore weighs toward a finding of custodial status. *Id*.  However, because the interview took place in a break room rather than a typical interrogation room, this factor does not weigh heavily toward finding that defendant was

in custody. *United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) (explaining that not all interviews at the police station should be considered police dominated).

The sixth and final factor asks whether the suspect was placed under arrest at the termination of the questioning. *Griffin*, 922 F.2d at 1349. Defendant was not placed under arrest at the termination of the interviews on April 17, 2004. Of course, the agents did not want to arrest defendant at that time because he was still willing to respond to questions. On May 4, 2004, when defendant finally refused to answer any more questions, the agents placed him under arrest. The Court is convinced that the agents would have placed defendant under arrest whenever he decided that he would no longer willingly participate. Under these circumstances, this factor does not weigh heavily in either direction.

After considering the totality of the circumstances, the Court finds that defendant was not in custody during the first interviews at the FBI office on April 17, 2004. The agents were careful to inform defendant at the beginning of the interviews that his participation was voluntary and that he could terminate his participation at any time. The agents again advised defendant of the voluntary nature of his participation at the end of the interviews. This is powerful evidence that a reasonable person would have understood that he was free to terminate the interviews. *Czichray*, 378 F.3d at 826. Indeed, on subsequent days in the interview process, defendant acknowledged verbally and in writing that he understood that his participation was voluntary.

Defendant was given a Miranda warning on April 18, 2004. Because the Court finds that defendant was not in custody prior to administration of the Miranda warning,

defendant's argument that his statements must be suppressed because they were taken without the benefit of a Miranda warning must fail.

### B. Voluntariness of Defendant's Consent to Participate In Interviews

Defendant argues in the alternative that his statements must be suppressed because his consent to participate in the interviews was the product of coercion. A defendant's consent is voluntary "if it was the product of an essentially free and unconstrained choice, rather than the product of duress or coercion, express or implied." *United States v. Moreno*, 373 F.3d 905, 910 (8th Cir. 2004) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 227 (1973)).

"The voluntariness of a consent is a question of fact to be determined from the totality of the circumstances surrounding both the environment of the encounter and the nature of the consenting party." *Id.* Relevant aspects of the environment include the length of the detention, whether the police used threats or physical intimidation, whether the police made promises or misrepresentations, whether the defendant was in custody when the consent was given, and whether the consent occurred in a public or secluded place. *United States v. Smith*, 260 F.3d 922, 924 (8th Cir. 2001). Individual characteristics relevant to the voluntariness of consent include age, general intelligence and education, whether the defendant was under the influence of drugs, whether the defendant had been given Miranda warnings, and whether the defendant had experienced prior arrests and was thus aware of the protections that the legal system affords to suspected criminals. *Id.*

Defendant argues that he repeatedly sought to end the interview process "but was instead strung along" by the agents. (Mem. In Supp. at 14.) Because agents intended to arrest him as soon as he stopped cooperating, defendant argues that his choice to cooperate was a constrained choice from the beginning.

The evidence shows that defendant chose to cooperate with agents because he thought he could clear his name through his cooperation. Defendant was clearly deceived by the officers and now understandably regrets his willingness to cooperate, but the Court is convinced that defendant freely made the choice to cooperate. In fact, there is no evidence in the record that defendant ever sought to end the interview process until May 4, 2004. One of the key factors that courts consider when assessing the voluntariness of a consent is whether a defendant had been given a Miranda warning and therefore knew he had a right to refuse to answer questions. *Bustamonte*, 412 U.S. at 227. Here, the agents repeatedly advised defendant that his participation in the interviews was voluntary and that he could end the interviews at any time.[2] And as discussed above, defendant acknowledged his understanding of the voluntariness of his participation both verbally and in writing. In fact, the defendant acknowledged time and time again that he understood his rights.

---

[2] Although the fact that agents repeatedly advised defendant of the voluntary nature of his participation is strong evidence that defendant's statements were voluntary, the totality of the circumstances must be considered. Surely it is possible that statements can be coerced even when agents tell a defendant that his participation is voluntary, especially if the interviews last over several days. For example, suppression might be warranted in a situation where the accused has characteristics that make him or her more vulnerable, or in a situation where the environment in which the consent was given was more intimidating. *Bustamonte*, 412 U.S. at 226.

When defendant finally stated on May 4, 2004 that he would no longer willingly answer questions, the agents promptly stopped the interview. If any questioning had occurred after this point, the Court would have suppressed any statements thereafter obtained as the product of coercion. The Court agrees with defendant that the agents took full advantage of defendant's willingness to answer questions over the 17-day period and planned all along to arrest him as soon as he stopped answering questions, but in the Court's view, this does not make defendant's choice to participate in the interviews the product of coercion.

To be sure, the Court is significantly troubled by the excessively long duration of the interviews here. There is a real danger that interviews that last over several days will become coercive. *Ashcraft v. Tennessee*, 322 U.S. 143, 153 (1944). However, the Court finds from a careful review of the record no evidence that defendant's initial willingness to cooperate had with the passage of time degraded to the point that the interviews had become coercive. Moreover, the length of an interrogation is just one of many factors to be considered when assessing the voluntariness of consent. *Smith*, 260 F.3d at 924. The Court must assess the totality of the circumstances, including both the characteristics of the defendant and the environment of the interrogation. *Moreno*, 373 F.3d at 910. While 17 days of interrogation is undoubtedly long, a simple quantitative measure of the length of the interrogation cannot compel the conclusion that the consent was coerced.

In sum, despite the deceptive tactics and methods used, and the lengthy interviews, the Court finds that the circumstances present here do not show that Elzahabi's participation in the interviews was the product of coercion. The record shows that the

defendant continuously expressed his understanding that he could stop the interviews at any time, yet nevertheless willingly continued to participate in a misguided attempt to clear his name.

## ORDER

Based on the foregoing, and all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendant's motion to suppress statements [Docket No. 55] is **DENIED**.

DATED:   June 5, 2007  
at Minneapolis, Minnesota.

                                            s/ John R. Tunheim  
                                            JOHN R. TUNHEIM  
                                            United States District Judge